## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **FISHERMAN SURGICAL INSTRUMENTS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 06-2082-KHV** |
| **TRI-ANIM HEALTH SERVICES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Fisherman Surgical Instruments, LLC ("Fisherman") brings suit against Tri-anim Health

Services, Inc. ("Tri-anim"), alleging that Tri-anim breached the terms of its agreement to distribute

Fisherman's general surgical instruments.  This matter is before the Court on Defendant's Motion

For Summary Judgment (Doc. #249), plaintiff's Motion For Summary Judgment Ruling That

Parties' Agreement Is An Enforceable Contract With Five Year Term And With Exclusivity (Doc.

#253) and Defendant Tri-anim Health Services' Motion To Exclude Plaintiff Fisherman Surgical

Instruments' Proposed Expert Witness John Meara (Doc. #255), all filed May 7, 2007.  For reasons

stated below, the Court sustains the cross-motions for summary judgment in part and sustains

defendant's motion to exclude Meara.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(c);

accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d

1535, 1538-39 (10th Cir. 1993).  A factual dispute is "material" only if it "might affect the outcome

of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248.  A "genuine" factual dispute requires more than a mere scintilla of evidence.  <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hicks v. City of Watonga</u>, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on his pleadings but must set forth specific facts.  <u>Applied Genetics</u>, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  <u>Anderson</u>, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 251-52.

## **Factual Background**

The following material facts are uncontroverted or deemed admitted.[1]

Brandon Johnston and Ken Hare own Fisherman Surgical Instruments, LLC.  In June of 2003, Fisherman began doing business as a specifications developer, i.e. a packager and labeler, of surgical instruments.  In December of 2004, Fisherman began negotiations for Tri-anim Health Services, Inc. to distribute its surgical instruments.  In January of 2005, Tri-anim sold medical products in all 50 states and so advised Fisherman.  On February 24, 2005, Fisherman and Tri-anim executed a Distribution Agreement in which Fisherman agreed to supply and Tri-anim agreed to exclusively sell general surgical instruments from Fisherman.  The Distribution Agreement specified a five-year term, as follows:

> The term of this Agreement shall be for a period of five (5) years with an effective date of February 15, 2005 and shall automatically renew in one-year increments unless terminated by either party without cause with a 90 day written notice to the other party.

Id. at 1.  The Distribution Agreement did not contain sales goals or objectives.  In the agreement, however, Tri-anim committed to the following:

> 1. So long as this Agreement is in effect, meet sales goals and objectives mutually agreed upon by Tri-anim and Manufacturer.  Sales goals and objectives for calendar year 2005 shall be established by June 1, 2005 and included in Exhibit A.  Sales goals and objectives for subsequent years of this Agreement will be established by January 1, 2006 and will be included as a revision to Exhibit A.  * * *
>
> 10. Provide professionally trained sales staff to sell the value of Products over competitive products.  * * *

---

[1]    The Court does not consider facts which the record does not support or which are not relevant to the legal issues presented.  Both parties have presented extensive extrinsic evidence to aid in contract interpretation, but the Court does not find it necessary to consider such evidence in resolving the parties' cross-motions for summary judgment.

12.    Not sell the Products outside of the United States of America (USA) or knowingly to any company who intends to sell the Products outside of the USA.

13.    Solely represent and distribute the Products as the only comparable surgical instrument line available from Tri-anim (excluding Geister or a manufacturer of comparable Geister products).

Distribution Agreement at 1-2.  The Distribution Agreement did not contain Exhibit A, which was supposed to establish agreed sales goals, and neither party ever proposed an Exhibit A.

In the Distribution Agreement, Fisherman agreed as follows:

1.    So long as this Agreement is in effect, provide support for the Products indicated in Exhibit B, at pricing in effect at the time of order from Tri-anim. Products may be added, deleted or modified at [Fisherman's] option. [Fisherman] will keep Tri-anim notified of product related changes.  * * *

10.    Allow the option to return all new, unused and demo Products for full credit if Manufacturer terminates Tri-anim or adds any other distribution within Tri-anim's designated area.  Termination without cause, including sale or merger of Manufacturer, requires 90 days notice and no additional distribution may be added in Tri-anim's area prior to the final termination, so long as Tri-anim continues to maintain sufficient inventory and continues to fill orders.  Termination for cause requires 30 days notice.  Termination of the Agreement shall not release Manufacturer or Tri-anim from any liability or obligation which has accrued or remains to be performed.

11.    Forward all price inquiries from customers in Tri-anim's sales area to Tri-anim.  * * *

14.    Provide access to all Products nationwide through Tri-anim's e-commerce strategy, online or paper catalog and corporate Agreements.

Id. at 3-4.

At some point in 2005, after it began to sell Fisherman instruments, Tri-anim and/or its customers began to complain about quality problems with the instruments.  On June 6, 2005, Tri-anim acquired the assets of Adler, a surgical instrument distribution company.  Fisherman asserts

that through former sales representatives for Adler, Tri-anim began selling Jarit surgical instruments which competed with Fisherman products.

On October 21, 2005, Fisherman's attorney sent a letter to Robert Byers, president of Tri-anim.  The letter stated that Tri-anim had not fully performed under the Distribution Agreement because (among  other things) it had not established sales goals and objectives for 2004 or exclusively sold Fisherman instruments.  See Depo. Exhibit 54.

On October 26, 2005, Byers replied to Fisherman's attorney by terminating the Distribution Agreement, effective immediately.  More specifically, Byers stated as follows:

> We are in receipt of your letter of October 21, 2005 with reference to our agreement dated February 15, 2005 . . . .  Please be advised that Tri-anim . . . hereby terminates the Agreement immediately because of material defaults by Fisherman.  Specifically there have been numerous e-mails documenting the poor quality of the allegedly high-end Fisherman products.
>
> Alternatively, Tri-anim hereby deems the Agreement null and void as merely an agreement to agree.  Specifically, Exhibits A (Sales Goals) and Exhibit B (Products Price List) were never agreed to or appended to the Agreement.  Your suggestion that Sales Goal was Tri-anim's obligation is at odds with the Agreement, which specifically states that they shall be mutually agreed to.  Additionally, the Agreement refers to "Tri-anim's designated area," but never defines what that is.

Depo. Exhibit 56.

On March 8, 2006, Fisherman filed suit against Tri-anim, asserting claims for breach of contract and promissory estoppel.  Tri-anim asserted affirmative defenses, including mutual mistake, unilateral mistake and fraud.  It also asserted counterclaims for breach of express and implied warranties, rescission, breach of contract, fraud and negligent misrepresentation.  Fisherman's only computation of damages is contained in the report of its expert, John Meara.

Tri-anim seeks summary judgment that as a matter of law, (1) the Distribution Agreement is not enforceable because it does not contain a quantity term; (2) to the extent that the Distribution

Agreement is enforceable, either party could terminate it without cause upon 90 days written notice during the initial five year term; (3) the Distribution Agreement (and, accordingly, Fisherman's right to damages) is limited to an 11-state Western Region; (4) Fisherman cannot recover damages because Meara should be excluded from testifying under Rule 702, Fed. R. Evid., and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993); and (5) Fisherman did not timely disclose damages on its promissory estoppel claim.  Fisherman seeks summary judgment that as a matter of law, (1) the Distribution Agreement is enforceable; (2) its term clause provides for a fixed, initial five year term which cannot be terminated without cause; and (3) the Distribution Agreement includes all 50 states.

## Analysis

### I.      Statute Of Frauds - Quantity Term

Tri-Anim argues that the statute of frauds bars Fisherman's claims for breach of contract (Count I) and promissory estoppel (Count II) because the Distribution Agreement has no quantity term.  Fisherman maintains that the statute of frauds does not bar enforcement of the Distribution Agreement because the agreement is a requirements or exclusive dealing contract, and such contracts do not require a specific quantity term.  Based on their respective interpretations, both parties seek partial summary judgment on Counts I and II.

An enforceable contract for the sale of goods for $500 or more requires a writing which states a quantity term.  See S.W. Eng'g Co. v. Martin Tractor Co., 205 Kan. 684, 688, 473 P.2d 18, 22 (1970).  The Kansas UCC statute of frauds states as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his

authorized agent or broker.  *A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing*.

K.S.A. § 84-2-201(1) (emphasis added).

Tri-anim argues that the Distribution Agreement is unenforceable because even though the parties contemplated that Tri-anim would purchase products from Fisherman based on "sales goals and objectives mutually agreed upon," Distribution Agreement at 1, ¶ 1, the parties never agreed on such goals.  Fisherman concedes that the parties never established sales goals, but it maintains that the Distribution Agreement is an exclusive dealing and requirements contract which does not require a specific written quantity term.[2]

The Kansas UCC sets forth certain principles relating to requirements and exclusive dealing

---

[2]     Tri-anim argues that Fisherman waived this argument because it did not raise Kansas UCC Section 2-306 or "exclusive requirements contracts" in the Pretrial Order.  See Defendant's Reply (Doc. #318) at 27.  Tri-anim can hardly claim surprise or prejudice, however, because Fisherman raised these arguments in the motion for summary judgment which it filed *before* the Court entered the pretrial order.  Cf. Hullman v. Bd. of Trustees, 950 F.2d 665,667 (10th Cir. 1991) (excluding new argument raised in summary judgment brief filed after entry of pretrial order).  The pretrial order specifically references Fisherman's pending motion for summary judgment.  See Pretrial Order (Doc. #271) filed May 25, 2007 at 46-47.  Moreover, the pretrial order states that the relevant legal issues include whether the Distribution Agreement is a valid and enforceable contract and whether the statute of frauds bars enforcement of some or all of Fisherman's claims.  See id. at 38.  Fisherman's current arguments are reasonably encompassed by the pretrial order.  See Theno v. Tonganoxie Unified Sch. Dist. No. 464, 394 F. Supp.2d 1299, 1303 (D. Kan. 2005) (pretrial order liberally construed to cover all legal or factual theories embraced by language or inherent in issues defined therein); Van Enters., Inc. v. Avemco Ins. Co., 231 F. Supp.2d 1071, 1081 (D. Kan. 2002) (pretrial order liberally construed to cover any legal or factual theories that might be embraced by its language) (citing Koch v. Koch Indus., Inc., 179 F.R.D. 591, 596 (D. Kan. 1998)); see also Fed. R. Civ. P. 8(f) (pleadings construed to do substantial justice).

Tri-anim also argues that even Meara, Fisherman's expert, did not consider the Distribution Agreement to be a requirements contract.  Defendant's Reply (Doc. #318) at 27.  To the extent that the precise legal title of the Distribution Agreement is relevant, however, that issue is a question of law for the Court.  See Wagnon v. Slawson Exploration Co., 255 Kan. 500, 511, 874 P.2d 659, 666 (1994) (construction of written contract is question of law).

contracts.  See K.S.A. § 84-2-306.  First, a term which measures quantity by the seller's output or the buyer's requirements means such actual output or requirements as may occur in good faith. K.S.A. § 84-2-306(1).  Second, a lawful agreement by either the seller or buyer for exclusive dealing in the kind of goods concerned imposes an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.  K.S.A. § 84-2-306(2).[3]  Under UCC Section 2-306, a requirements contract is not too indefinite for lack of a quantity term because quantity is determined by "the actual good faith . . . requirements of the particular party."  UCC § 2-306, Official Cmt. 2; see Gestetner, 815 F.2d at 811; O.N. Jonas Co. v. Badische Corp., 706 F.2d 1161, 1164 (11th Cir. 1983).  For a requirements contract to be valid, the buyer must promise to buy the goods exclusively from the seller.  K.S.A. § 84-2-306, Kansas Cmt. 2 (if exclusivity absent, contract lacks mutuality because buyer might order all requirements from other suppliers); see Propane Indus., Inc. v. Gen. Motors Corp., 429 F. Supp. 214 (W.D. Mo. 1977) (applying Kansas law); see also Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp., 186 F.3d 815, 817 (7th Cir. 1999) (requirements contract obligates buyer to buy all specified material exclusively from seller and obligates seller to fill buyer's needs).

Tri-anim maintains that the Distribution Agreement is not a requirements contract because

---

[3]     An exclusive dealing contract is typically a requirements contract as well.  See 2 R. Anderson, Uniform Commercial Code Section 2:306:42, at 530 (1982); see also 2 W. Hawkland UCC Series Section 2-306:3 (Art. 2) (1982) (exclusive territory contract is variant of requirements contract).  The good faith obligation under a requirements contract, however, is slightly different from the good faith obligation under an exclusive dealing contract.  In a requirements contract, the buyer is obligated to use good faith in determining requirements.  Gestetner Corp. v. Case Equip. Co., 815 F.2d 806, 811 (1st Cir. 1987); see Kan. Power & Light Co. v. Burlington N. R.R., 740 F.2d 780, 788 (10th Cir. 1984) (in typical requirements contract, buyer agrees to buy all of item it requires in good faith from seller); Miller v. Sirloin Stockade, 224 Kan. 32, 33-34 578 P.2d 247, 248-49 (1978).  In an exclusive dealing contract, the seller is obligated to use best efforts to supply goods and the buyer is obligated to use best efforts to promote the sale.  Gestetner, 815 F.2d at 811.

the parties did not specifically refer to the quantity as "buyer's requirements" or a similar reference.
Defendant's Reply (Doc. #318) at 27-28.  The UCC, however, does not require particular words to
enforce a requirements contract.  See Essco Geometric v. Harvard Indus., Inc., 46 F.3d 718, 728 (8th
Cir. 1995).  The exclusivity clause in the Distribution Agreement is sufficient to satisfy the quantity
term.  The exclusivity clause provides that Tri-anim agreed to "[s]olely represent and distribute the
Products as the only comparable surgical instrument line available from Tri-anim (excluding Geister
or a manufacturer of comparable Geister products)."  Distribution Agreement at 2, ¶ 13.  Combined
with Tri-anim's promise to "provide a professionally trained sales staff to sell the value of the
product," id. at 2, ¶ 10, the promise to solely distribute Fisherman products provides an exclusive
dealing arrangement (at least as to those products not available from Geister) and creates a
requirements contract.[4]  Kan. Power & Light, 740 F.2d at 789 (in requirements contracts, which by
their nature may not be explicit in quantity, courts will imply promise that buyer's requirements be
in good faith) (citing Miller, 224 Kan. 32, 578 P.2d 247); Advent Sys. Ltd. v. Unisys Corp., 925
F.2d 670, 676-79 (3d Cir. 1991) (exclusive and non-exclusive arrangements satisfy statute of frauds
even if no specific quantity is stated); id. at 679 (UCC recognizes exclusive requirements contracts
and imposes on parties to such agreements duty of good faith; exclusive requirements contracts

---

[4]     Tri-anim argues that even a requirements or exclusive dealing contract must include
a quantity term in writing.  See Defendant's Reply (Doc. #318) at 27 (citing James Lockhart,
Annotation, Establishment and Construction of Requirements Contracts Under § 306(1) of the
Uniform Commercial Code, 94 A.L.R.5th 247 (2001), §§ 2(b), 3 and Medline Indus., Inc. v. Keilei
Int'l, Inc., No. 89-C-4822, 1992 WL 133012, at *6 (N.D. Ill. May 29, 1992)).  Both authorities cited
by Tri-anim, however, recognize that the quantity term in a requirements or exclusive dealing
contract need not be numerically stated.  See Medline, 1992 WL 133012, at *6; see also Lockhart,
94 A.L.R.5th at 278, § 2(a) (term creating exclusive dealing arrangement may create requirements
contract); id. § 3 (contract defining quantity in terms of buyer's requirements satisfies statute of
frauds).

satisfy quantity requirements of statute of frauds albeit no specific amount is stated).

Tri-anim argues that the Distribution Agreement was not an exclusive dealing contract because Fisherman had the right to add other distributors. Defendant's Reply (Doc. #318) at 28-29. The Distribution Agreement stated that Fisherman agreed to "[a]llow the option to return all new, unused and demo Products for full credit if [Fisherman] terminates Tri-anim or adds any other distribution within Tri-anim's designated area." Distribution Agreement at 3, ¶ 10. Tri-anim interprets this paragraph to mean that Fisherman had the unilateral right to add other distributors to Tri-anim's designated area. Paragraph 10, however, supports the Court's conclusion that the agreement was an exclusive dealing arrangement unless Fisherman terminated Tri-anim as a distributor or added another distributor within Tri-anim's area. In effect, paragraph 10 granted Tri-anim certain rights in the event Fisherman terminated the exclusive dealing arrangement. Such a provision does not destroy the exclusive dealing arrangement set forth elsewhere in the Distribution Agreement. See Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1126 n.7 (3d Cir. 1992) (by itself, remedies clause which allows seller to sell product to other buyers if buyer does not order stated minimums does not destroy exclusivity of contract).

Finally, Tri-anim argues that because the agreement contemplates that quantity "would be stated in absolute terms, once the parties arrived at mutual agreement" and the parties never agreed on a precise quantity, the Court cannot infer a quantity term based on the exclusive dealing arrangement. Defendant's Memorandum (Doc. #250) at 9-10; Defendant's Reply (Doc. #318) at 29-30. Tri-anim cites no authority for its argument. The Distribution Agreement merely contemplated that the parties would agree on a minimum sales amount for each year. The fact that the parties never agreed on such amount does not invalidate the Distribution Agreement. As

explained above, other portions of the Distribution Agreement adequately established the parties' intent to create an exclusive dealing arrangement.  <u>See</u> Distribution Agreement at 2, ¶ 13 (Tri-anim agreed to solely represent and distribute Fisherman products as only surgical instrument line available from Tri-anim); <u>id.</u> at 2, ¶ 10 (Tri-anim agreed to provide professionally trained sales staff to sell value of Fisherman products over competitive products); <u>see also</u> <u>id.</u> at 3, ¶ 10 (Fisherman agreed to allow Tri-anim option to return all product if Fisherman added distributor in Tri-anim's designated area).

In sum, the Kansas UCC statute of frauds does not bar enforcement of the Distribution Agreement.  Accordingly, the Court overrules Tri-anim's motion for summary judgment and sustains Fisherman's motion on this issue.

## II.    Contract Interpretation

Under Kansas law, construction of a written contract is a matter of law for the Court. <u>Wagnon</u>, 255 Kan. at 511, 874 P.2d at 666.  "In construing a contract, the intent of the parties is the primary question; meaning should be ascertained by examining the documents from all corners and by considering all of the pertinent provisions, rather than by critical analysis of a single or isolated provision; and reasonable rather than unreasonable interpretations are favored." <u>Akandas, Inc. v. Klippel</u>, 250 Kan. 458, Syl. ¶ 1, 827 P.2d 37, Syl. ¶ 1 (1992).  Where a contract is complete and unambiguous on its face, the Court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence. <u>Simon v. Nat'l Farmers Org.</u>, 250 Kan. 676, 679-80, 829 P.2d 884, 887-88 (1992).

Whether an instrument is ambiguous is a question of law for the Court. <u>Id.</u>  A contract is ambiguous if it contains "provisions or language of doubtful or conflicting meaning, as gleaned from

a natural and reasonable interpretation of its language." <u>Id.</u>  Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." <u>Marquis v. State Farm Fire & Cas. Co.</u>, 265 Kan. 317, 324, 961 P.2d 1213, 1219 (1998).  A contract is not ambiguous merely because it does not address an issue.  <u>TMG Life Ins. Co. v. Ashner</u>, 21 Kan. App.2d 234, 242, 898 P.2d 1145, 1154 (1995).

"In construing an ambiguous . . . contract, the court may take into consideration the interpretation placed upon the contract by the parties themselves.  If the parties have by their conduct placed an interpretation on an ambiguous contract, it will be followed by the court." <u>First Nat'l Bank of Olathe v. Clark</u>, 226 Kan. 619, 624, 602 P.2d 1299, 1304 (1979) (citation omitted).  Accordingly, the Court looks to the subsequent conduct of the parties – their practical construction of terms of the contract.  <u>See</u> <u>City Of Wichita, Kan. v. S.W. Bell Tel. Co.</u>, 24 F.3d 1282, 1287 (10th Cir. 1994).  "If parties to a contract, subsequent to its execution, have shown by their conduct that they have placed a common interpretation on the contract, this interpretation will be given great weight." <u>Id.</u> (citing <u>Heyen v. Hartnett</u>, 235 Kan. 117, 123, 679 P.2d 1152, 1157 (1984); <u>First Nat'l Bank of Olathe</u>, 602 P.2d at 1304; <u>Reese Exploration, Inc. v. Williams Natural Gas Co.</u>, 983 F.2d 1514, 1519 (10th Cir. 1993)).

When a contract is not ambiguous, the Court may not rewrite a contract to achieve an equitable result under the guise of contract construction.  <u>See</u> <u>Quenzer v. Quenzer</u>, 225 Kan. 83, 85, 587 P.2d 880, 882 (1978); <u>see also</u> <u>Patrons Mut. Ins. Ass'n v. Harmon</u>, 240 Kan. 707, 713, 732 P.2d 741, 746 (1987).  In addition, unless a contrary intent is demonstrated, contracting parties are presumed to have in mind all existing and applicable statutes and case law relating to the contract.

See Anderson v. Nat'l Carriers, Inc., 240 Kan. 101, 105, 727 P.2d 899, 903 (1986); Steele v. Latimer, 214 Kan. 329, 336, 521 P.2d 304, 310 (1974).  Accordingly, unless a contrary intent is shown, all existing applicable or relevant and valid statutes, ordinances and regulations, and settled law at the time the contract was made, become a part of the contract and must be read into it.  Steele, 214 Kan. at 336, 521 P.2d at 310; Cairo Coop. Exch. v. First Nat'l Bank of Cunningham, 228 Kan. 613, 619, 620 P.2d 805, 810 (1981); Heartland Premier, Ltd. v. Group B & B, L.L.C., 29 Kan. App.2d 777, 780, 31 P.3d 978, 981 (2001).

The Kansas UCC provides that it shall be liberally construed and applied to promote its underlying purposes and policies.  K.S.A. § 84-1-102(1).  Those purposes and policies are: "(a) to simplify, clarify and modernize the law governing commercial transactions; (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; [and] (c) to make uniform the law among the various jurisdictions."  K.S.A. § 84-1-102(2).

A.    Scope Of Distributorship

Tri-Anim seeks partial summary judgment that as a matter of law, the scope of any contract between the parties was limited to distribution of surgical instruments in 11 western states.  On the other hand, Fisherman seeks summary judgment that the Distribution Agreement covers the entire United States.

The Distribution Agreement does not specifically mention any geographical restriction on Tri-anim's distribution area.  Paragraph 13 of the Distribution Agreement provides as follows:

> Tri-anim agrees to . . . [s]olely represent and distribute the Products as the only comparable surgical instrument line available from Tri-anim (excluding Geister or a manufacturer of comparable Geister products.

Distribution Agreement at 2, ¶ 13.  On its face, Paragraph 13 is unlimited in territorial scope.

Paragraph 12, however, provides that Tri-anim cannot sell products outside the United States. Id. at 2, ¶ 12. The Distribution Agreement therefore encompasses the entire United States.

Tri-anim argues that the agreement is limited to 11 western states because certain portions of the Distribution Agreement refer to Tri-anim's "areas," "sales areas," and "designated area." See id. at 2, ¶ 16 (no additional distribution may be added by Fisherman in Tri-anim's "areas" before final termination); id. at 3, ¶ 10 (Fisherman agrees to allow return of products if it adds other distribution within Tri-anim's "designated area"); id. at 4, ¶ 11 (Fisherman agrees to forward all price inquiries from customers in Tri-anim's sales area). The terms of the Distribution Agreement, however, do not suggest that the Tri-anim sales area was limited to any 11 states or any other area less than the entire United States. As explained above, in ascertaining whether the contract is ambiguous, the Court is limited to the four corners of the written agreement. One possible meaning of Tri-anim's sales area is the entire United States. That construction is supported by the paragraph which prohibits Tri-anim from selling outside the United States and the paragraph which provides that Fisherman's obligation to provide access to products through Tri-anim's e-commerce strategy, online or paper catalog and corporate Agreements is "nationwide." Id. at 4, ¶ 14. Tri-anim insists that the parties did not intend the Distribution Agreement to be nationwide, but it cannot cite any part of the agreement which limits the geographical scope to less than the United States. See Jo-Ann, Inc. v. Alfin Fragrances, Inc., 731 F. Supp. 149, 153 (D.N.J. 1989) (intent expressed or apparent in written document controls). Based on a natural and reasonable interpretation of the language in the Distribution Agreement, the only possible meaning of Tri-anim's "area" is the entire United States. The Court therefore sustains Fisherman's motion for summary judgment and overrules Tri-anim's motion on this issue.

B.    Interpretation Of Term Provision

Tri-anim seeks partial summary judgment that as a matter of law, the Distribution Agreement allowed either party to terminate the contract at any time without cause on 90 days notice.  On the other hand, Fisherman seeks summary judgment that the Distribution Agreement could not be terminated without cause during the initial five year term.

The Distribution Agreement set forth the term of the agreement as follows:

The term of this Agreement shall be for a period of five (5) years with an effective date of February 15, 2005 and shall automatically renew in one-year increments *unless* terminated by either party without cause with a 90 day written notice to the other party.

Distribution Agreement at 1 (emphasis added).  Tri-anim argues that the "without cause" termination clause qualifies both the initial five year period and any subsequent renewal periods, so that either party could terminate the contract without cause on 90 days notice during the initial contract term or any one-year renewal period.  Fisherman maintains that the "without cause" termination clause applies "only after expiration of the initial five year term to prevent renewal," and that Tri-anim could not terminate the contract without cause within the initial five-year term.  Plaintiff's Memorandum (Doc. #272) at 29-30.

From the five-year term provision alone, the Court cannot ascertain whether the parties intended to allow termination without cause in the initial five-year term or only in subsequent renewal periods.  As explained above, the Court must first attempt to determine the parties' intent from the four corners of the contract.  Heyen, 235 Kan. at 122, 679 P.2d at 1156; see First Nat'l Bank of Olathe, 226 Kan. at 624, 602 P.2d at 1303 (before resort to extrinsic evidence, instrument interpreted from its four corners).  Thus all language used anywhere in the instrument should be taken into consideration and construed in harmony with the "without cause" termination clause.

<u>Heyen</u>, 235 Kan. at 122, 679 P.2d at 1156; <u>see</u> <u>First Nat'l Bank of Olathe</u>, 226 Kan. at 624, 602 P.2d at 1303; <u>see also</u> <u>Neustrom v. Union Pac. R.R.</u>, 156 F.3d 1057, 1063 (10th Cir. 1998) (intent of parties is determined from four corners of unambiguous instrument, harmonizing language therein if possible) (citing <u>Hall v. JFW, Inc.</u>, 20 Kan. App.2d 845, 848, 893 P.2d 837, 840 (1995)).

In addition to the five-year term provision, paragraph 10 of the Distribution Agreement stated as follows:

> [Fisherman agrees to] [a]llow the option to return all new, unused and demo Products for full credit if Manufacturer terminates Tri-anim or adds any other distribution within Tri-anim's designated area.  Termination without cause, including sale or merger of Manufacturer, requires 90 days notice and no additional distribution may be added in Tri-anim's area prior to the final termination, so long as Tri-anim continues to maintain sufficient inventory and continues to fill orders.  Termination for cause requires 30 days notice.  Termination of the Agreement shall not release Manufacturer or Tri-anim from any liability or obligation which has accrued or remains to be performed.

Depo. Exhibit 14 at 3, ¶ 10.  Fisherman insists that this paragraph does not apply to the initial five year term, but only to subsequent renewals of the agreement.  Its proposed interpretation is consistent with a standard "evergreen" provision,[5] which allows a contract to automatically renew without further action by the parties.  Fisherman's argument, however, is inconsistent with the parties' agreement in this case.  On its face, paragraph 10 is not limited to the initial five year term.  In addition, paragraph 10 identifies the sale or merger of Fisherman as a an example of a reason to terminate the agreement without cause.  The Distribution Agreement does not prohibit Fisherman's

---

[5]     The termination clause in an evergreen provision typically specifies that it applies after the initial term or it is linked to the renewal date of the contract.  <u>See, e.g.</u>, <u>Vulcan Materials Co. v. Atofina Chems. Inc.</u>, 355 F. Supp.2d 1214, 1240 (D. Kan. 2005) (termination provision specifically applied "after the Initial Term"); <u>Novant Health, Inc. v. Aetna U.S. Healthcare of Carolinas, Inc.</u>, No. 98-CVS-12661, 2001 WL 34054420, at *1 (N.C. Super. Mar. 8, 2001) (termination provision linked to 180 days notice before "such date," which was the five year renewal date)

sale or merger during the initial five-year term (or at any other time), which strongly suggests that at any time, the parties could terminate the agreement without cause on 90 days notice. A natural and reasonable interpretation of paragraph 10, together with the term clause on page 1 of the Distribution Agreement, suggests that either party had the right to terminate the agreement at any time without cause on 90 days notice and to terminate the agreement for cause on 30 days notice.

Fisherman maintains that if the contract is read to allow termination without cause during the initial five year term, the term clause which establishes a five-year term is meaningless. Id. at 30. The Eighth Circuit addressed a similar argument in Boat Dealers' Alliance, Inc. v. Outboard Marine Corp., 182 F.3d 619 (8th Cir. 1999), where the contract provided as follows:

> A. This Agreement shall be in full force and effect for an initial period of not less than five (5) years from the "anniversary date" of: July 1, 1997.
>
> B. Either party may terminate without cause if, not less than ninety (90) days prior to the anniversary date, written notice is provided as set forth in Section 23 of this Agreement. After the initial five-year period, this Agreement shall continue in effect from year-to-year. After the initial five year period, either party may terminate this agreement for valid cause, on ninety (90) days notice.

Id. at 620-21. Like Fisherman, plaintiff in Boat Dealers' Alliance argued that "it would be inconsistent to interpret a contract with a five-year duration as allowing termination without cause before its expiration date and would render the contract illusory." Id. at 621. The Eighth Circuit rejected this argument. It held that "because both parties had the right to terminate the contract without cause during the first five years, but could only do so by giving the required notice, the contract is not illusory." Id. (citing Laclede Gas Co. v. Amoco Oil Co., 522 F.2d 33, 36-37 (8th Cir. 1975)); see Flight Concepts Ltd. P'ship v. Boeing Co., 819 F. Supp. 1535, 1554 (D. Kan. 1993) (contract not illusory where parties have right to terminate contract on notice).

Next, Fisherman argues that under the rule of the last antecedent, the "without cause"

termination clause modifies only the one-year renewal terms.  Fisherman's Memorandum (Doc. #254) at 24.  The rule of the last antecedent is an interpretative principle by which a court determines that "qualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing."  Black's Law Dictionary at 1360 (8th ed. 2004); see Gullett v. Van Dyke Constr. Co., 111 P.3d 220, 224 (Mont. 2005) (absent contrary intent, qualifying words or phrases should be applied only to immediately preceding words and phrases); Phoenix Control Sys., Inc. v. Ins. Co. of N. Am., 796 P.2d 463, 466 (Ariz. 1990) (same).  The rule of the last antecedent, however, is not "uniformly binding" and where the sense of the entire relationship requires that a qualifying word or phrase apply to several preceding sections, the word or phrase will not be restricted to its immediate antecedent.  Alvarado v. J.C. Penney Co., 735 F. Supp. 371, 374 (D. Kan. 1990).  As explained above, based on the entire Distribution Agreement, the Court finds that the 90-day "without cause" termination clause applies to both the initial five-year term and any subsequent renewal periods.

Fisherman argues that a 90-day "without cause" termination provision is inconsistent with the multi-year features in other parts of the contract.  Fisherman's Memorandum (Doc. #254) at 23. Fisherman notes that the parties contemplated setting sales goals in "subsequent years," Distribution Agreement at 1, ¶ 1, and that Fisherman would not have terminated its sales force, transferred inventory and started training Tri-anim sales representatives if the contract could be terminated without cause on 90 days notice.  The parties indeed may have intended and hoped for a long term relationship, but the intent expressed or apparent in the written document is what controls.  See Jo-Ann, 731 F. Supp. at 153.  Moreover, a right to terminate the contract on 90 days notice is not

necessarily inconsistent with the intent to maintain a long term relationship.

For the above reasons, the Court finds that the Distribution Agreement allowed either party to terminate the contract at any time without cause on 90 days notice.  The Court sustains Tri-Anim's motion for partial summary judgment and overrules Fisherman's motion for summary judgment on this issue.

C.    Scope Of Potential Damages

Tri-anim seeks partial summary judgment that even if Fisherman did not breach the Distribution Agreement, Tri-anim terminated it without cause on October 26, 2005 and that Fisherman's damages (if any) are therefore limited to the period from October 26, 2005 to January 25, 2006, i.e. 90 days after Tri-anim notified Fisherman it was terminating the agreement effective immediately.  Fisherman seeks partial summary judgment that because Tri-anim did not cite the termination without cause provision in its letter of October 26, 2005, it forfeited the right to terminate the Distribution Agreement without cause.

On October 26, 2005, Tri-anim stated that it was terminating the agreement effective immediately because of material defaults by Fisherman and that in the alternative, the agreement was merely an agreement to agree and not an enforceable contract.  Depo. Exhibit 54.  Fisherman cites no authority for its argument that Tri-anim waived its right to terminate the agreement without cause by failing to specifically exercise that right in its termination letter.  As of October 26, 2005, Fisherman knew that Tri-anim wanted to terminate the agreement immediately.  Therefore, regardless whether Tri-anim properly terminated the agreement for cause,[6] the Court finds that its letter of October 26, 2005 constituted sufficient notice to Fisherman that it was terminating the

---

[6]    Neither party seeks summary judgment on this issue.

agreement.  The purpose of the UCC remedial provisions is to put the aggrieved party in as good a position as if the other party had fully performed.  K.S.A. § 84-1-106.  Under the Distribution Agreement, Fisherman was only entitled to 90 days notice in the event Tri-anim terminated the agreement without cause.  Accordingly, Fisherman cannot recover damages related to termination of the agreement beyond January 25, 2006.  The Court sustains Tri-anim's motion for summary judgment and overrules Fisherman's motion on this issue.

### III.   Damages Expert - John Meara

Tri-anim seeks summary judgment that as a matter of law, Fisherman cannot recover damages because its expert testimony should be excluded under Rule 702, Fed. R. Evid., and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).  Tri-anim has also filed a separate motion to exclude Meara's testimony.  See Defendant Tri-anim Health Services' Motion To Exclude Plaintiff Fisherman Surgical Instruments' Proposed Expert Witness John Meara (Doc. #255).

Fisherman retained Meara as its damage expert in this case.  In his report, Meara provides three opinions on damages which Fisherman allegedly incurred on account of Tri-anim's breach of the Distribution Agreement.

In his first opinion, Meara assumes that Tri-anim would distribute Fisherman products outside of Group Purchasing Organization ("GPO") contracts.[7]  Meara calculates damages from June of 2005, when Tri-anim allegedly breached the Distribution Agreement by distributing competing products, to February 24, 2010, five years after the parties executed the Distribution Agreement.  To calculate five years of lost sales, Meara uses a sales model which assumes that (1) in February

---

[7]     GPO contracts are agreements by which vendors sell high volumes of instruments at reduced prices to groups of hospitals and/or surgical centers who have agreed to cooperate as consumers.

of 2005, Tri-anim had 13 sales representatives and Fisherman had seven independent sales representatives who were available for Tri-anim to hire; (2) in June of 2005, Tri-anim added 22 sales representatives; (3) Tri-anim would add two new sales representatives each month from December of 2005 to June of 2008; and (4) each new sales representative required three months of training. In this sales model, Meara incorporates evidence that Fisherman products were of comparable quality to products of other manufacturers, specifically Jarit Surgical Instruments; that Tri-anim designated Fisherman as a "Prime A" vendor; and that Gary Kautz (Tri-anim director of surgical sales) expected at least $5,000 in sales of Fisherman products per month per sales representative. Based on these assumptions, Meara projects that but for the alleged breach by Tri-anim, Tri-anim would have sold $1,938,550 in Fisherman products in fiscal year 2006 (July 1, 2005 through June 30, 2006). Combined with other assumptions as to Fisherman overhead, Meara calculates total lost profits of $3,883,000 for the five years of the initial contract term ending February 24, 2010.

In his second opinion, Meara calculates that because Tri-anim breached the Distribution Agreement, Fisherman will suffer a loss in the value of its ongoing business at the end of the five-year contract term. Meara opines that in the first five years of the Distribution Agreement, Fisherman and Tri-anim would have developed an economic interdependence, that each would incur significant loss without the Distribution Agreement, and that this situation would have encouraged the parties to merge their operations or renew their agreement at the end of five years. From empirical data regarding mergers and acquisitions, and considering the structure of the Distribution Agreement, Meara calculates the present value of Fisherman's "exit/acquisition value" at the end

of the five-year contract term to be $1,776,000.[8]  Combined with the total lost profits of $3,883,000 (from the first opinion), Meara calculates total lost profits over the term of contract and lost value at the end of the contract period to be $5,659,000.

Meara's third opinion is a variation of his first and second opinions.  In his third opinion, Meara re-calculates lost profits over the contract period by assuming that Tri-anim would gradually begin to distribute Fisherman products through existing or future GPO contracts.  Meara bases this assumption on the "facts" that Tri-anim distributed Jarit products through GPO contracts, that Fisherman products could displace Jarit products, that Fisherman had an opportunity to break into GPO sales, and that GPO members had previously purchased Fisherman products outside of GPO contracts.  Meara applies the same basic sales model as in first opinion, except that in years two and three of the contract, he gradually increases the expected sales of Fisherman products from $5,000 to $21,500 per month per sales representative.[9]  Over the initial five years of the contract, Meara calculates total lost profits of $10,543,000.  As in his second opinion, Meara adds to his total lost profits figure the lost value of Fisherman's ongoing business at the end of five years, and calculates the present value of Fisherman's "exit/acquisition value" to be $6,681,000.  Combined with the total lost profits of $10,543,000, Meara's third opinion calculates total lost profits over the term of contract and lost value at the end of the contract period to be $17,224,000.

---

[8]    Meara's opinion does not clearly state whether this lost value is wholly attributable to Tri-anim's alleged breach of the Distribution Agreement.  In light of its ruling on Tri-anim's summary judgment motion, however, the Court need not determine the precise amount of lost value on account of Tri-anim's alleged breach.

[9]    Meara stated that the higher monthly sales numbers were a result of Tri-anim's "penetration of [the] GPO market."  The $21,500 figure matched Tri-anim's actual average monthly sales per sales representative of Jarit products – which Tri-anim sold under GPO contracts.

Tri-anim argues that under Rule 702 and <u>Daubert</u>, the Court should excluded Meara's opinions because they rely on unreasonable and unfounded assumptions and unreliable data. Specifically, Tri-anim argues that Meara's methodology is flawed because (1) the projections regarding Tri-anim's sales force and monthly sales are not supported by contract terms or historical data; (2) the calculation of Fisherman's "exit/acquisition value" rests on the contingency that Tri-anim would purchase Fisherman at the end of the initial contract period – which Tri-anim was not obligated to do; and (3) no evidence demonstrates that Tri-anim would have been qualified to sell Fisherman products through GPO contracts. For reasons stated in Tri-anim's supporting briefs, the Court is in substantial agreement with these arguments.[10]

Under Rule 702, the trial court must act as a gatekeeper and determine at the outset, pursuant to Rule 104(a), "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." <u>Daubert</u>, 509 U.S. at 592. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. <u>Id.</u> Rule 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

---

[10] Tri-anim also argues that Meara should be precluded from testifying about damages on Fisherman's promissory estoppel claim because Meara offers no opinion regarding such damages. In response, Fisherman states that Meara will not offer any testimony outside of his disclosures and opinions, and apparently concedes that Meara cannot testify as to promissory estoppel damages. <u>See Plaintiff's Memorandum In Opposition To Defendant Tri-anim's Motion To Exclude Plaintiff's Expert Witness John Meara, CPA, ABV, CFE</u> (Doc. #274) at 39-40. Tri-anim's argument is therefore well taken.

The decision whether to admit or exclude expert testimony is committed to the sound discretion of the district court. Latshaw v. Mt. Carmel Hosp., 53 F. Supp.2d 1133, 1136 (D. Kan. 1999).

"[W]hen the proffered expert relies on some principle or methodology," the trial court should consider a nonexhaustive list of nondispositive factors in determining whether the reasoning or methodology is scientifically valid or reliable: "(1) Can it and has it been tested?; (2) Has it been subjected to peer review and publication?; (3) Does it have a known or potential rate of error?; and (4) Has it attained general acceptance in the relevant scientific community?" Compton v. Subaru of Am., Inc., 82 F.3d 1513, 1518 (10th Cir. 1996). As part of the pretrial evaluation, the district court must determine whether the expert opinion is "based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation." Kieffer v. Weston Land, Inc., 90 F.3d 1496, 1499 (10th Cir. 1996) (quoting Jones v. Otis Elevator Co., 861 F.2d 655, 662 (11th Cir. 1988)). The touchstone of admissibility is helpfulness to the trier of fact. Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 648 (10th Cir. 1991).

As noted above, Tri-anim argues that Meara's methodology is flawed because the projections regarding Tri-anim's sales force and monthly sales are not supported by contract terms or historical data.

A.    Sales Force Projections

In all three opinions, Meara assumes that by 2008, Tri-anim would have expanded its sales force from 13 to 101 sales representatives if it had not breached the Distribution Agreement. This assumption rests on Meara's conclusion that Tri-anim intended to expand its distribution of Fisherman products nationwide and could do so within 3.5 years. Tri-anim argues that it was not contractually bound to enlarge its sales force and that practical considerations would have precluded

-24-

Meara's projected expansion.

    Fisherman responds that the Distribution Agreement contemplated nationwide distribution, and that Kansas law obligated Tri-anim to attempt to expand its distribution efforts accordingly.  See K.S.A. § 84-2-306, UCC Official Cmt. 5 (under exclusive dealing contract, distributor required "to use reasonable effort and due diligence in the expansion of the market or promotion of the product"); see also Distribution Agreement at 2, ¶ 10 (Tri-anim agreed to provide professionally trained sales staff to sell value of Fisherman products over competitive products).  Aside from any theoretical or legal obligation, however, the record contains no evidence that Tri-anim could reasonably have expanded its distribution of Fisherman products to a nationwide market in 3.5 years.  Fisherman does not defend Meara's estimate, except to claim that it is conservative.  Meara's report is silent as to any factual support for his 3.5-year expansion time frame,[11] and Tri-anim argues that its actual performance in selling surgical instruments after it entered the market in February of 2005, belies

───────────────

    [11]    It appears from Meara's report that the 3.5 year time frame derives from his assumption that Tri-anim would have expanded its sales force at a rate of two representatives per month until its sales force reached 101 representatives – a number which Meara concludes is necessary to support a nationwide distribution scheme.  Because Meara offers no factual support for his assumption that the market would have supported an expanded sales force at a rate of two representatives per month, these projections are unreliable.  Therefore, the rate of expansion of the sales force cannot support Meara's ultimate conclusion that Tri-anim would operate nationwide within 3.5 years.

    In support of Meara's conclusion, Fisherman cites a document prepared in January of 2005, entitled "Tri-anim Facts."  That document states that "[Tri-anim's surgical calls] division is scheduled for nationwide coverage by 2006."  Exhibit 7 attached to Fisherman's Factual Record Supporting Memorandum Opposing Tri-anim's Motion To Strike Meara And Tri-anim's Motion For Summary Judgment ("Fisherman's Factual Record") (Doc. #276).  Although this document purportedly expresses Tri-anim's desire to expand its distribution of surgical instruments nationwide, it does not demonstrate the reasonableness or feasibility of such market expansion.  In fact, the record indicates that the document and its projections were made before Tri-anim actually began selling any general surgical instruments.  See Affidavit Of Robert A. Byers, Jr. Dated June 22, 2007 ¶ 2.  In any event, Meara's report does not indicate that he reviewed this document, and his projections of Tri-anim's expansion therefore continue to lack any apparent credible basis.

Meara's projections.  The record contains evidence that the surgical instrument market is mature and experiences little yearly growth.  <u>See</u> <u>Expert Witness Report Of J. Stephen Holmes</u> at 17-18. Further, the record contains evidence that Tri-anim took more than 20 years to grow its first division nationwide.  <u>See</u> Pister Depo. at 95.  While Meara concludes that 101 sales representatives are required to accommodate a national distribution scheme, he cites no evidence that the market could support a nationwide sales force at Tri-anim within 3.5 years.  This hole in Meara's sales model renders all of his damage calculations, which are premised on lost sales nationwide, unreliable.

      B.    <u>Monthly Sales Projections</u>

In all three opinions, Meara assumes that each sales representative would average $5,000 per month in sales of Fisherman products.  Meara bases this figure on email correspondence from Brandon Johnston (Fisherman president and part owner) recalling a comment by Gary Kautz (Tri-anim director of surgical sales) at the 2005 national sales meeting as follows:

> Gary said that [Fisherman] was [Tri-anim's] "Prime A" vendor and that he expected at least $5,000 per month in [Fisherman] sales per representative and for them to commit to that number and there was no one who did not agree with that.

Exhibit J attached to <u>Expert Witness Report Of John W. Meara</u> at 24.  Meara tested the reasonableness of his sales model by comparing the annual sales projection under the model ($1,938,550) with Tri-anim's expected sales from vendors, including Fisherman, which Tri-anim designated as "Prime A" vendors in 2006 ($2,000,000).

Tri-anim argues that Meara's monthly sales estimate of $5,000 is not reliable because it is based on Kautz's unfounded "motivational comment," is not memorialized in the Distribution Agreement, and ignores historical data regarding sales of Fisherman products.  Tri-anim further argues that its sales expectations for "Prime A" vendors do not support the reasonableness of the

$5,000 figure because the "Prime A" designation rests on the prospect that a product may reach $2,000,000 in annual sales, but does not guarantee such sales.

The foundation for Meara's monthly sales estimate is flimsy, to say the least.  In light of the evidence that Kautz lacked experience in surgical instrument sales and was engaged in "puffery" at the national sales meeting in 2005, Meara's unquestioning adoption of Kautz's $5,000 monthly sales estimate is troublesome.  See TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 727-28 (10th Cir. 1993) (reliable projection of future sales requires expertise or personal knowledge of market for which forecast is made).  The record contains empirical evidence – which Meara did not consider – that Tri-anim's actual sales of Fisherman products fell well below $5,000 per month (in fact, somewhere between $277 and $1,100 per month).[12]  Further, Tri-anim's designation of Fisherman as a "Prime A" vendor does not validate Meara's sales estimate.  The record indicates that the "Prime A" designation is bestowed on a vendor with potential sales of $2,000,000.  See Exhibit 115 attached to Fisherman's Factual Record (Doc. #276) at 4. This designation does not guarantee or establish a reasonable basis to project $2,000,000 in actual sales.  In fact, other vendors which Tri-anim has designated as "Prime A" vendors have not satisfied this sales potential and have been stripped of the "Prime A" designation.  See Affidavit Of Robert A. Byers, Jr. Dated June 22, 2007 ¶¶ 5-6.  Meara's $5,000 monthly sales estimate correlates with the $2,000,000 annual sales goal of

---

[12]    In 2005, Tri-anim's sales of Fisherman products through 12 sales representatives totaled approximately $39,900.  See Exhibit P attached to Defendant Tri-anim Health Services' Memorandum In Support Of Motion To Exclude Plaintiff Fisherman Surgical Instruments' Proposed Expert Witness John Meara (Doc. #257).  In the roughly ten-month period from the execution of the distribution agreement in late February to the end of 2005, this total sales figure represents approximately $277 in sales per month per representative.  Even assuming that all of these sales occurred in the three-month period before Tri-anim allegedly breached the distribution agreement in June of 2005, the total sales figure would represent approximately $1,100 in sales per month per representative.

"Prime A" vendors, but Meara does not demonstrate that Tri-anim reasonably could have sold Fisherman products at such a level under prevailing market conditions.[13]

Meara's opinion contains no apparent methodology – generally accepted or otherwise – which would generate projections that Tri-anim could grow its sales force by two representatives per month, with those sales representatives averaging $5,000 per month (increasing in Meara's third opinion to $21,500 per month) in sales of Fisherman products.  See Target Market Publ'g, Inc. v. ADVO, Inc., 136 F.3d 1139, 1145 (7th Cir. 1998) (business plan which identifies target profit, but does not project actual profits, not sufficient basis to assess damages).  Instead, Meara relies on Tri-anim sales forecasts, projections and goals, all of which were based on limited information and devoid of valid market analysis.  Because Meara's conclusions lack support in a reliable methodology for predicting actual sales, they would not assist the trier of fact.[14]  See TK-7, 993 F.2d at 727-28 (reliable projection of future sales requires expertise or personal knowledge of market for

---

[13]  As a fallback, Fisherman argues that Meara's $5,000 estimate is reasonable in light of Tri-anim's sales of Jarit products, which averaged between $25,000 and $34,000 per month per representative.  The crux of Fisherman's argument is that its products are comparable in quality to Jarit's, and that the $5,000 estimate of monthly sales is therefore conservative and reasonable when measured against Tri-anim's sales of Jarit products.

Meara's opinion, however, does not indicate that to substantiate the $5,000 monthly sales estimate he relied on evidence of Tri-anim sales of Jarit products.  Thus, the fundamental defect in Meara's sales model – that he deferred to unverified sales forecasts – remains.  Moreover, despite evidence that Fisherman products initially appeared to be of similar quality to other high-end surgical products such as Jarit, the record contains evidence that Fisherman instruments discolored more quickly, were different in functionality and needed to be replaced more frequently.  See Trunk Depo. at 20-24.  This evidence suggests that over a five year period, the market would not accept Fisherman products as the equivalent of Jarit products and undermines Fisherman's argument that Tri-anim's sales of Jarit products can be used as an indicator of Tri-anim's future sales of Fisherman products.

[14]  The deficiency in Meara's monthly sales estimates infects each of his three opinions, but is magnified in his third opinion which gradually increased the expected sales of Fisherman products per month per sales representative from $5,000 to $21,500 by December of 2007.

-28-

which forecast is made); <u>Sunlight Saunas, Inc. v. Sundance Sauna, Inc.</u>, 427 F. Supp.2d 1022, 1030 (D. Kan. 2006) (where expert assumes truth of sales forecasts without independent analysis, no reasonable jury would accept such forecasts as valid predictors of actual sales); <u>see also</u> <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997) (expert may extrapolate from existing data, but court may reject expert conclusion where "there is simply too great an analytical gap between the data and the opinion offered).

> C.    <u>Tri-anim's Remaining Objections</u>

Tri-anim raises arguments specific to Meara's second and third opinions.  The Court need not address these arguments in light of its ruling on Tri-anim's motion for summary judgment that Fisherman cannot recover damages beyond January 25, 2006. <u>See</u> <u>supra</u> Analysis, Part II. C., at 19-20.  As noted above, Meara's second opinion calculates the lost value of Fisherman's ongoing business at the end of the five-year contract period under merger and acquisition principles.  Meara opines that a five-year business relationship between Tri-anim and Fisherman would create an economic incentive for the parties to either renew their agreement or merge their operations.  Meara does not suggest that the same economic incentive existed in January of 2006 – less than one year into the contract – when Tri-anim effectively terminated the contract without cause.  Indeed, the fact that Tri-anim terminated the Distribution Agreement suggests that Meara's assumptions about the parties' economic incentives is incorrect, at least in the short term.  Meara's calculation of Fisherman's loss of value in his second opinion relates to damages beyond January 25, 2006, which Fisherman cannot recover in this case.

Meara's third opinion predicts higher monthly sales of Fisherman products through GPO contracts.  Specifically, in contrast to the basic sales model which Meara uses in his first opinion

(which assumes constant monthly sales of $5,000 per sales representative), Meara's third opinion uses a modified sales model which gradually increases the monthly sales figure per representative to reflect Tri-anim's penetration of the GPO market. According to the sales model, this increase would have begun in January of 2007. Because Fisherman may only recover damages incurred through January 25, 2006, however, its damages cannot include any amount of lost GPO sales under this model. Meara's third opinion therefore is irrelevant to the pending issues in this case.

For reasons stated above, the Court excludes the testimony of Meara.

### IV.   Fisherman's Remaining Evidence Of Damages

Tri-anim argues that if Meara is excluded, Fisherman cannot recover damages on its claims because the "only evidence of a computation of any category of damages claimed by Fisherman is John Meara's report." Defendant's Memorandum (Doc. #250) at 7, Fact ¶ 20. In opposition to Tri-anim's motion for summary judgment, Fisherman attempted to controvert this fact but cited several factual paragraphs which do not address damages. See Plaintiff's Memorandum (Doc. #272) at 13-14, Fact ¶¶ 20, 22-27. In the argument section of its memorandum, Fisherman does not address this issue. See id. at 28. In addition, Fisherman does not address Tri-anim's argument that proof of lost profits and lost business value requires specialized knowledge and that non-expert testimony on this issue is too speculative for new businesses. See Defendant's Memorandum (Doc. #250) at 12-13. The Court need not address whether an expert is necessary to testify on lost profits and lost business value because aside from Meara, Fisherman has not identified any individual, expert or non-expert, to testify on these issues. Accordingly, the Court sustains Tri-anim's motion on Count I (breach of contract) which seeks only lost profits and lost business value. See Pretrial Order (Doc. #271) at 39-40.

On Count II (promissory estoppel), Fisherman seeks reliance damages such as costs associated with training Tri-anim representatives, preparing an expanded catalogue, acquiring additional inventory and acquiring additional liability insurance.[15]  See id. at 40-41.  Tri-anim argues that Fisherman did not timely disclose damages on its promissory estoppel claim and in fact first identified such damages in the pretrial order.  On December 18, 2006, some five months before the Court entered the pretrial order, Fisherman identified various categories of expenditures which it incurred in reliance on Tri-anim's promises.  See Fisherman's Answers to Tri-anim's Second Interrogatories, Nos. 3-4, included in Plaintiff's Memorandum (Doc. #272) at 17-21.  Fisherman identified the individuals with knowledge of such expenditures and generally referred to documents which would be produced to support such expenditures.  See id.  Shortly after Fisherman answered the interrogatories, counsel produced the underlying documents which detailed the expenses incurred.  See id. at 37; Affidavit of William D. Beil ¶¶ 2-3.  Tri-anim does not explain how the document production was insufficient, but argues that an interrogatory response cannot refer to the some 13,000 pages of documents produced in this case.  Absent evidence of the documents produced, however, and how they were identified, the Court cannot find that Fisherman failed to sufficiently identify its damages and the evidence supporting them.  The Court therefore overrules Tri-anim's motion for summary judgment as to damages on Fisherman's claim for promissory estoppel.[16]

---

[15]     Fisherman also seeks "lost profits based on conduct of Fisherman's business without Tri-anim" for 2005, 2006 and 2007.  Id. at 41.  Because Fisherman has not identified an expert or non-expert to testify on the issue of lost profits, it appears that this category of damages will be excluded at trial.

[16]     Fisherman also claims that on January 30, 2007, it disclosed Brandon Johnston as an
(continued...)

**IT IS THEREFORE ORDERED** that <u>Defendant's Motion For Summary Judgment</u> (Doc. #249) filed May 7, 2007 be and hereby is **SUSTAINED in part**.  The Court sustains defendant's motion to the extent it finds as a matter of law that (1) the Distribution Agreement allowed either party to terminate the contract at any time without cause on 90 days notice; (2) Fisherman cannot recover damages for breach of the Distribution Agreement beyond January 25, 2006 – 90 days after Tri-anim notified Fisherman of its intent to terminate the Distribution Agreement; and (3) Fisherman cannot recover damages on Count I (breach of contract) because its expert testimony on this claim is inadmissible and it has cited no other evidence of damages.  The Court sustains defendant's motion on Fisherman's claim for breach of contract.  Tri-anim's motion is otherwise overruled.  Fisherman's claim for promissory estoppel remains for trial.

**IT IS FURTHER ORDERED** that plaintiff's <u>Motion For Summary Judgment Ruling That Parties' Agreement Is An Enforceable Contract With Five Year Term And With Exclusivity</u> (Doc. #253) filed May 7, 2007 be and hereby is **SUSTAINED in part**.  The Court sustains plaintiff's motion in the following respects: (1) the Kansas UCC statute of frauds does not bar enforcement of the Distribution Agreement and (2) the geographical scope of the Distribution Agreement is the entire United States.  Plaintiff's motion is otherwise overruled.

**IT IS FURTHER ORDERED** that <u>Defendant Tri-anim Health Services' Motion To</u>

---

[16](...continued)
expert witness on damages for its promissory estoppel claim, <u>see</u> <u>Plaintiff's Memorandum</u> (Doc. #272) at 21, 37.  Fisherman, however, did not attach a copy of this disclosure to its opposition brief.  Moreover, Fisherman concedes that it did not provide a copy of any damage calculations for its promissory estoppel claim under Rule 26(a)(1)(C), Fed. R. Civ. P.  Primarily because the Court cannot ascertain the volume of documents produced by Fisherman counsel in late December of 2006, or how counsel identified the specific documents relating to damages, these issues are not sufficiently developed in the briefing on Tri-anim's motion for summary judgment.  The Court therefore declines to address these issues in the context of the present motions.

Exclude Plaintiff Fisherman Surgical Instruments' Proposed Expert Witness John Meara (Doc. #255) filed May 7, 2007 be and hereby is **SUSTAINED**.

Dated this 20th day of August, 2007 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge